UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LEWELLYN CHARLES COX, IV,

Plaintiff,

v.

UNITED STATES OF AMERICA,

et al.,

Defendants.

Case No. 8:16-CV-01222-CJC (KES)

AMENDED REPORT AND
RECOMMENDATION OF U.S.
MAGISTRATE JUDGE

This Amended Report and Recommendation ("R&R") is submitted to the Honorable Cormac J. Carney, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

# CONTENTS

INTRODUCTION. ..................................................................................................3

FACTUAL BACKGROUND..................................................................................4

SUMMARY OF THE ALLEGATIONS AND MOTIONS TO DISMISS. ...........10

    A.    Allegations in Plaintiff's TAC. ...........................................................10

        1.    Count One: Defendant Casler's Falsification of Evidence Regarding Jamala Pratt's License Plate and Ms. Bacque's Identification. .........................10

        2.    Count Two: Defendants Schwark and Casler's Coercive Photo Lineup Procedure and Interview of Ms. Bacque. ...........................................................11

        3.    Count Three: Defendant Mikkelson's Fabrication of Evidence and Bribery of Ms. Bacque.........................................................................................13

        4.    Count Four: FTCA Claim Against the United States for Failing to Provide Adequate Payment for Investigators...................................................14

    B.    Motions to Dismiss Briefing. ............................................................15

LEGAL STANDARDS. ........................................................................................17

    A.    Elements of Plaintiff's Civil Rights Claims. .....................................17

    B.    Motions to Dismiss. ...........................................................................18

DISCUSSION........................................................................................................19

    A.    This Court Lacks Jurisdiction Over Plaintiff's Unexhausted FTCA Claim.... ..............................................................................................................19

    B.    Plaintiff Does Not Allege that Defendants' Evidence Fabrication Caused Deprivation of His Liberty or Property..................................................................20

        1.    Prosecution in the Criminal Case. ........................................................23

        2.    Investigator Expenditure......................................................................32

        3.    Emotional Distress. ..............................................................................35

    C.    Plaintiff Cannot Obtain Injunctive Relief as a Remedy for the Alleged Violations of His Civil Rights...............................................................................36

    D.    Plaintiff's Outstanding Requests........................................................37

        1.    Plaintiff's Request to Amend His TAC. ...............................................37

        2.    Plaintiff's Discovery Requests..............................................................41

CONCLUSION.......................................................................................................43

RECOMMENDATION. ........................................................................................43

# I.

## INTRODUCTION.

On April 25, 2018, pro se Plaintiff Lewellyn Charles Cox, IV ("Plaintiff") constructively filed his Third Amended Complaint ("TAC"). (Dkt. 107.) On May 15, 2018, Defendant Curt Casler moved to dismiss Plaintiff's TAC. (Dkt. 109.) Plaintiff filed an opposition docketed on June 14, 2018. (Dkt. 117.) Defendant Casler replied on June 22, 2018. (Dkt. 121.) On August 6, 2018, Defendants United States of America, James Mikkelson, and Wesley Schwark (the "Federal Defendants") moved to dismiss Plaintiff's TAC. (Dkt. 133.) Plaintiff filed three responses.[1] (Dkts. 141, 142, 143.) The Federal Defendants replied on September 18, 2018. (Dkt. 144.)

The Amended R&R addresses Plaintiff's objections to the initial R&R that was issued on December 17, 2018. (Dkts. 150 [R&R], 151 [Objections].) The discussion has been amended to address Plaintiff's new, unpled contention that he suffered an injury (i.e., deprivation of liberty and property) caused by a sentencing error (Dkt. 151 at 1-10, 13-16, 21-22), and that the Court inaccurately stated Plaintiff's arguments and several facts. (Id. at 10-12, 17-19.) The Court's recommendation remains unchanged, however.

The Court finds the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons below, Defendants' motions to dismiss are GRANTED without further leave to amend.

---

[1] Two responses were docketed on September 4, 2018. (Dkts. 141, 142.) The third response was docketed on September 12, 2018. (Dkt. 143.) The first response indicates that Plaintiff "seeks to drop the claim for monetary damages, and proceed only on the claim for an injunction." (Dkt. 141.) The second response includes both a request to file an oversized brief and Plaintiff's actual opposition briefing. (Dkt. 142.) Plaintiff's request to file the oversized brief is GRANTED. The third response clarifies certain allegations in Plaintiff's TAC. (Dkt. 143.)

## II.

## FACTUAL BACKGROUND.

Plaintiff's TAC asserts claims against Orange County Sheriff's Detective Curt Casler, the United States of America, and Secret Service Agents Wesley Schwark and James Mikkelson (together, "Defendants") arising from conduct related to an underlying criminal case, United States of America v. Lewellyn Cox, et al., 09-cr-248-DOC (C.D. Cal. 2009) (the "Criminal Case"). (See Dkt. 107 at 4-9.) In that case, a grand jury indicted Plaintiff on bank fraud and identity theft charges in February 2011. (Criminal Case, Dkt. 30.) In December 2011, Plaintiff pled guilty through a "straight up" plea without a plea agreement to seventeen counts in the Second Superseding Indictment. (Criminal Case, Dkts. 403, 521, 674.) One of those seventeen counts was later dismissed because Plaintiff was not charged in that count. (Criminal Case, Dkts. 1476 [6/30/14 RT] at 22; 1647 at 18-19.)

The District Judge held several pre-sentencing evidentiary hearings to determine the loss attributable to Plaintiff. (Criminal Case, Dkts. 1313, 1345, 1346, 1347 [hearing minutes].) On July 1, 2014, the District Judge sentenced Plaintiff to 25 years in custody and ordered him to pay $8 million in restitution. (Criminal Case, Dkt. 1351 [judgment].) Plaintiff subsequently appealed. See United States v. Lewellyn Cox, IV, Case No. 14-50325 (9th Cir. 2014); United States v. Lewellyn Cox, IV, Case No. 15-50453 (9th Cir. 2015); United States v. Lewellyn Cox, IV, Case No. 16-50415 (9th Cir. 2016).[2] On December 26, 2018, the Ninth Circuit

---

[2] In his three consolidated appeals, Plaintiff argues that the District Judge in his Criminal Case erred in: (1) denying his request for self-representation; (2) failing to grant a brief continuance of sentencing; (3) denying his request to withdraw his guilty plea; (4) incorrectly calculating the sentencing guidelines; (5) dismissing his post-judgment motions for lack of jurisdiction; and (6) denying his motion for disqualification of the District Judge. (Case No. 14-50325, 15-50453 & 16-50415, Dkt. 70 [Appellant's Opening Brief].) On June 30, 2014, Plaintiff sought to withdraw his guilty plea, stating his attorney did not advise him

affirmed Plaintiff's conviction, holding the District Judge did not err or abuse his discretion in: (1) delaying a <u>Faretta</u> hearing; (2) denying a sentencing continuance to allow Plaintiff's second investigator, Tracy Spada, to testify or introduce her report "because this evidence was insignificant"; (3) denying Plaintiff's request to withdraw his plea; (4) calculating the loss amount pursuant to the sentencing guidelines; (5) dismissing Plaintiff's <u>pro se</u> post-judgment motions; or (6) denying Plaintiff's motion to disqualify the District Judge. <u>Id.</u>, Dkt. 137-1; <u>United States v. Cox</u>, 2018 WL 6787546 (9th Cir. Dec. 26, 2018).

Plaintiff's current civil claims relate to the events that first led investigators to suspect Plaintiff's involvement in the bank fraud conspiracy underlying his Criminal Case. According to Defendant Schwark's testimony during a pre-sentencing evidentiary hearing in the Criminal Case, Plaintiff first became linked to the conspiracy in October 2005 when a man named Adam Jones contacted investigators after his girlfriend was arrested for cashing an unauthorized check. (Criminal Case, Dkt. 1475 [6/27/14 RT] at 75, 131.) Per Defendant Schwark, Mr. Jones reported that he had been asked to recruit people (including his girlfriend) to cash unauthorized checks; Mr. Jones reported that in May 2005, he met with an African-American male named "Homicide" and an unknown African-American male at South Coast Plaza Mall to exchange checks. (<u>Id.</u> at 75-76, 78, 131.) Defendant Casler then contacted mall security and asked if they had logged any suspicious activity on that date. (<u>Id.</u> at 75.) Mall security reported that on that date, they saw people meeting and recorded a license plate belonging to a silver Mercedes. (<u>Id.</u>) By running the license plate through the Secret Service database, Defendant Schwark traced the license plate to Jamala Pratt (Plaintiff's ex-wife) and

of the potential loss amount prior to pleading guilty; the District Judge found: "I'm convinced that your plea was free and voluntarily. … There was every modicum of due process afforded to you during that plea …." (Criminal Case, Dkt. 1647 [6/30/14 RT Vol. II] at 16.)

discovered the association between Ms. Pratt and Plaintiff. (Id. at 76-77.) Defendants Schwark and Casler then showed Mr. Jones a photograph of Plaintiff and Mr. Jones stated that Plaintiff appeared to be the man in the car with "Homicide." (Id. at 78-79.)

Plaintiff's current civil claims also relate to events surrounding an individual formerly known as Jessica Bacque.[3] Ms. Bacque was convicted of cashing unauthorized checks. (Id. at 83.) A deputy initially interviewed Ms. Bacque upon her arrest, and on June 15, 2005, Defendant Casler interviewed Ms. Bacque while she was in custody. (Dkt. 142 at 35-36 [Casler police report].) During her interview with Defendant Casler, Ms. Bacque reported that on May 16, 2005, she cashed an unauthorized check and gave the money to two men in a new white Jaguar with paper plates—one was an African-American male named "Homicide" and the other was an unknown Asian male. (Id.) She also reported that on May 23, 2005—the day of her arrest—she retrieved an unauthorized check from four men in a blue/green Jaguar. (Id.) She reported that the driver was "Homicide"—the same African-American male from the May 16, 2005 incident—but she did not know the three passengers. (Id.)

According to Defendant Schwark's testimony during the pre-sentencing evidentiary hearing in the Criminal Case, following her release from custody, Ms. Bacque met with law enforcement for an interview at Defendant Casler's recommendation in November 2005. (Criminal Case, Dkt. 1475 [6/27/14 RT] at 82.) Before the interview, Defendants Schwark and Casler had identified Plaintiff as a suspect through the South Coast Plaza license plate identification, and they wanted to know if Ms. Bacque recognized Plaintiff. (Id. at 132.) During the interview, Ms. Bacque identified Plaintiff as the passenger of the white Jaguar that

---

[3] Ms. Bacque is now named Jessica Samra. For consistency with the parties' briefing and prior transcripts, this order refers to her by her previous name.

6

she had seen on May 16, 2005.  (Id. at 82-83.)  Specifically, Defendant Schwark testified that he and Defendant Casler showed Ms. Bacque a "six-pack" photo line-up and she identified Plaintiff; they subsequently showed her a single photo of Plaintiff wearing glasses for confirmation.  (Id. at 84.)  Defendant Schwark testified that Ms. Bacque circled Plaintiff's image on the photo line-up with the notation "passenger of white car Jag, 5/16/05."  (Id. at 82-83.)  This identification is dated "11/02/05" and signed by Ms. Bacque.  (Id. at 85; Dkt. 142 at 49 [photo array identification].)

Through Defendant Schwark's testimony, the government used Ms. Bacque's identification at the pre-sentencing hearing to attempt to establish Plaintiff's participation in criminal activity.  (Criminal Case, Dkt. 1475 [6/27/14 RT] at 82-84.)  At that hearing, Plaintiff's defense counsel called into doubt Ms. Bacque's identification of Plaintiff by pointing out that Defendant Casler completed a police report in June 2005—before Ms. Bacque's November 2005 interview—stating that she had seen an African-American male named "Homicide" and an unknown Asian male in the white Jaguar on May 16, 2005.  (Id. at 104-05.)  Therefore, because Plaintiff is African-American, not Asian, Ms. Bacque's identification of Plaintiff during her November 2005 interview appeared inconsistent with her earlier report to Defendant Casler.  (Id. at 103-04.)  Defendant Schwark testified that he had not noticed the discrepancy and might not have read Defendant Casler's June 2005 police report.  (Id. at 102-03.)

During this hearing, Plaintiff's defense counsel also noted that Defendant Mikkelson had earlier obtained a search warrant by stating in an affidavit that Ms. Bacque had identified Plaintiff as an African-American male inside the green/blue Jaguar on the date of Ms. Bacque's arrest, May 23, 2005—not as the passenger of the white Jaguar on May 16, 2005.  (Id. at 108.)  Plaintiff, however, argued that he was in custody on May 23, 2005, rendering Defendant Mikkelson's affidavit inaccurate.  (Id. at 118-20.)  Plaintiff's defense counsel stated that he would call

Defendant Mikkelson as a witness to address the inconsistency but never did so. (Id. at 123.)  Defendant Mikkelson had taken over the investigation from Defendant Schwark in 2007.  (Criminal Case, Dkt. 1474 [6/26/14 RT Vol. I] at 12, 100.)

Plaintiff called Ms. Bacque as a witness during the pre-sentencing evidentiary hearing.  (Criminal Case, Dkt. 1475 [6/27/14 RT] at 143.)  Plaintiff's counsel showed Ms. Bacque the photo line-up dated "11/02/05" where Ms. Bacque had purportedly circled Plaintiff's photo and identified him as present on May 16, 2005.  (Id. at 144.)  Ms. Bacque testified that the handwritten date memorializing her interview appeared to be in a different form than what she normally used.  (Id.)  She testified that she would have dated the photo lineup "11/2"—not "11/02"— because she would not "write a zero before the number unless it's the year."  (Id. at 144-45.)  The District Judge then advised Ms. Bacque of her Fifth Amendment rights and arranged for her to confer with an attorney.  (Id. at 141-54.)  Ms. Bacque exercised her Fifth Amendment rights and did not testify further.  (Id. at 158-59.)

Before her testimony, Ms. Bacque provided one of Plaintiff's Criminal Case investigators, Tracy Spada, with a signed statement.  (Criminal Case, Dkt. 1476 [6/30/14 RT Vol. I] at 59-60.)  After Ms. Bacque declined to testify further, Plaintiff told the District Judge that Ms. Bacque's signed statement indicated that Defendant Schwark had asked Ms. Bacque to identify "Homicide" once more but instead showed her Plaintiff's photo.  (Id. at 61.)  Plaintiff also stated that Ms. Bacque's signed statement indicated that Defendant Schwark circled Plaintiff's photo for Ms. Bacque and told her that he would expunge her record for identifying Plaintiff.  (Id.)

Due to these inconsistencies, the District Judge did not consider the incidents involving Ms. Bacque in calculating Plaintiff's sentence, including his restitution debt.  (Criminal Case, Dkt. 1477 [6/30/14 RT Vol. III] at 13, 18, 30, 31.)  The District Judge found that, given the large amount of fraud at issue, it did not matter for sentencing purposes whether or not Ms. Bacque's participation in the scheme

was taken into account.  (Id.)

The statement signed by Ms. Bacque indicates that she was questioned on three occasions: the date of her arrest (May 23, 2005), while incarcerated, and some unspecified time after her release.  (Dkt. 117 at 26 [Bacque signed statement].)  After her release, Ms. Bacque was "questioned about the 2005 incident by two Federal agents"[4] and one of the agents was named Mikkelson.  (Id.)  An agent told Ms. Bacque that he would "clear her record" and "pay her travel expenses" if she would agree to meet.  (Id.)  The agent "used his pen to 'circle certain sections pictures'" and he was "obviously trying to direct her to certain people …."  (Id.)  Ms. Bacque signed a form under the belief that her record would be expunged if she did so.  (Id. at 27.)  She also "began circling number of those she felt they wanted her to pick" to conclude the process.  (Id.)  Ms. Bacque was never presented a photo array of Asian male suspects.  (Id. at 29.)  Ms. Bacque has no recollection "of meeting with any members of law enforcement in San Bernardino who requested [she] view additional photo lineups" on or about November 2, 2005 (the date of the purported photo line-up identification), but at the time she "was again on drugs." (Id.)  Ms. Bacque does not recall writing or dating her November 2, 2005 identification of Plaintiff as the passenger in the "white Jag" and does not believe she would have included "a zero before a number" when writing a date.  (Id.)

Plaintiff's second investigator in his Criminal Case, Ms. Spada, prepared Ms. Bacque's signed statement.  In an ex parte in camera hearing held on June 13, 2014, Plaintiff indicated that his first investigator, Farzin Noohi,[5] was unable to find

---

[4] Where the meaning of a writing is clear, the Court has corrected obvious spelling and grammatical errors.

[5] Plaintiff refers to his first investigator as Mr. Farzin Nooli.  However, he was consistently referred to as Mr. Farzin Noohi in the Criminal Case (see, e.g., Criminal Case, Dkt. 1475 [6/27/14 RT] at 2), so this Court refers to him as Mr. Noohi.  Mr. Noohi was funded pursuant to the Criminal Justice Act, which prescribes the allocation of public funds to support an indigent defendant's defense.

9

potential defense witnesses, including Ms. Bacque; consequently, his mother hired Ms. Spada and paid her $2,500 to find the witnesses. (Criminal Case, Dkt. 1556 [6/13/14 RT] at 21-22.) Plaintiff told the District Judge that Ms. Spada had already found and interviewed three witnesses, including Ms. Bacque. (Id. at 30.) Plaintiff's counsel requested that the District Judge authorize thirty-five additional funded hours, so Ms. Spada could complete her investigation. (Id. at 24.) The District Judge stated that he wanted to hear from the witnesses Ms. Spada had already found at the next hearing on June 26, 2014, before "open[ing] up the checkbook again." (Id. at 26, 34, 43.) Plaintiff did not reintroduce his request for additional investigator funds. (See Criminal Case, Dkts. 1474, 1475, 1476, 1477.)

**III.**

**SUMMARY OF THE ALLEGATIONS AND MOTIONS TO DISMISS.**

**A.    Allegations in Plaintiff's TAC.**

Plaintiff's TAC alleges civil rights claims arising under 42 U.S.C. § 1983 and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), and a tort claim arising under the Federal Tort Claims Act ("FTCA"). Plaintiff divides his civil rights claims into three "Counts" and pleads his FTCA claim in "Count Four," as follows:

> **1. Count One: Defendant Casler's Falsification of Evidence Regarding Jamala Pratt's License Plate and Ms. Bacque's Identification.**

Plaintiff alleges that Defendant Casler "falsif[ied] evidence that Cox's Wife Jamala Pratt's Car was in the South Coast Plaza Mall Security Parking lot." (Dkt. 107 at 4.) Plaintiff asserts that "it was this license plate that put Cox on Schwark's 'radar'." (Id. at 7.) Plaintiff alleges that it would have been impossible for Defendant Casler to connect the car to Ms. Pratt, and thus to Plaintiff, because in

---

See 18 U.S.C. § 3006A.

May 2005, Ms. Pratt's car had "new car papers" from Randy's Auto Sales and did not display a license plate number.  (Id. at 4, 7.)  Further, Plaintiff alleges that his first Criminal Case investigator, Mr. Noohi, contacted the mall security and learned that the mall does not maintain a log of "incident free vehicles." [6]  (Id. at 4.)

Additionally, Plaintiff alleges that Defendant Casler "has violated the 14th Amendment to equal protection by changing the race of the suspect alleged to be the passenger with Angus Brown ["Homicide"] from an unknown Asian to Cox an obvious Black male."  (Id.)  The Court construes Plaintiff's "Count One" equal protection claim as alleging that Defendant Casler knew Ms. Bacque had stated during their June 2005 interview that an unknown Asian male was present in the vehicle with "Homicide" on May 16, 2005; despite this knowledge, Defendant Casler assisted in conducting the November 2005 coercive interview described in "Count Two."  Motivated by racial animus, he sought to implicate Plaintiff, an African-American male, instead of investigating Asian suspects.  (Dkt. 117 at 5 [clarification in Reply].)

### 2.  Count Two: Defendants Schwark and Casler's Coercive Photo Lineup Procedure and Interview of Ms. Bacque.

Plaintiff alleges that during the interview of Ms. Bacque in November 2005, Defendants Casler and Schwark conducted an intentionally coercive photo lineup process.  (Dkt. 107 at 5, 7.)  Plaintiff states that at one time, Defendant Schwark

---

[6] Defendant Casler did not testify at any pre-sentencing evidentiary hearing in the Criminal Case.  Instead, Defendant Schwark testified that Defendant Casler contacted mall security to obtain the license plate number, and then both Defendants ran it through the Secret Service database.  (Criminal Case, Dkt. 1475 [6/27/14 RT] at 76-77, 141.)  Regarding the license plate, Plaintiff only alleges that Defendant Casler engaged in wrongdoing, so the Court construes this as alleging that Defendant Casler somehow wrongfully generated the license plate number that he relayed to Defendant Schwark.  Plaintiff does not dispute that Ms. Pratt drove the car in question, a silver Mercedes.

presented Ms. Bacque with seven photos. Six photos composed the standard photo lineup and included one photo of Plaintiff; the seventh photo was a single, larger photo also of Plaintiff. Plaintiff was wearing a brown plaid shirt in both photos but was wearing glasses only in the smaller photo featured in the lineup.[7] (Id. at 5.) Plaintiff alleges that while showing Ms. Bacque these seven photos, Defendant Schwark asked her, "do you see him[?]" and stated, "appearance[s] change." (Id.) Additionally, Plaintiff states that Ms. Bacque provided a signed statement that "the Agent [Schwark] 'circled certain sections pictures' of individuals the agent wanted picked." (Id. at 8.) Plaintiff also states that Defendant Schwark failed to show Ms. Bacque photos of Asian suspects.[8] (Id. at 5.)

Plaintiff alleges that "this was very suggestive and designed to coerce Bacque and yield a false identification …." (Id. at 8.) Plaintiff asserts that this procedure constitutes a due process and equal protection violation. (Id. at 5.) Plaintiff alleges that Defendant Casler was present during Ms. Bacque's identification and is thus responsible for alleged civil rights violations that occurred during the photo lineup procedure. (Id. at 5.) Plaintiff, however, acknowledges that "the taint of the fabricated evidence was removed" when the District Judge declined to add to Plaintiff's sentence any loss amount or victim count associated with Ms. Bacque. (Id. at 9; see Criminal Case, Dkt. 1477 [6/30/2014 RT Vol. III] at 13, 18, 30, 31.) Plaintiff nevertheless maintains that the "constitutional violations remain[]." (Dkt. 107 at 9.)

---

[7] In his TAC, Plaintiff uses the April 4, 2014 testimony of Carla Romano to support the allegation that the photo lineup was conducted in this manner. (Dkt. 107 at 8.) Plaintiff clarifies that he is not bringing a claim for the "coercive" interview of Ms. Romano. (Id. at 9.)

[8] Plaintiff further alleges in his Reply to the Federal Defendants' Motion to Dismiss that Defendants Schwark and Casler darkened the photos in the array to obscure the difference in skin tone. (Dkt. 142 at 21.)

### 3. Count Three: Defendant Mikkelson's Fabrication of Evidence and Bribery of Ms. Bacque.

Plaintiff contends that when Defendant Mikkelson replaced Defendant Schwark as lead investigator on the case, he "was uncomfortable with the fact that the race of the suspect was changed from Asian to Black and decided to coerce Bacque to ID Cox again for being present on May 23, 2005 ...." (Id. at 5.) Plaintiff alleges that Defendant Mikkelson bribed Ms. Bacque by promising to "clear her record" (id.) and "pay travel expenses" (id. at 9) if she would falsely identify Plaintiff as present on May 23, 2005.[9] Plaintiff alleges that Defendant Mikkelson later realized Plaintiff was incarcerated on May 23, 2005, and forged the notation beside Plaintiff's photo—a notation purportedly by Ms. Bacque—identifying Plaintiff as a passenger of a white Jaguar on May 16, 2005. (Id. at 5, 10.) Plaintiff states that Ms. Bacque testified on June 27, 2014 "admitting to only her signature, stating [regarding the notation] 'it doesn't seem to be my writing', and stat[ing] that she would not put a zero before a single digit date ...." (Id. at 10.) Plaintiff alleges that Defendant Mikkelson used his coercive interview of Ms. Bacque to "construct[] his fabricated Search Warrant allegation ...." (Id.)

Additionally, Plaintiff alleges that Defendant Mikkelson "was clearly uncomfortable with Agent Schwark's and detective Curt Casler's method of identifying Cox, as being present on May 16, 2005, because the shirt in the six pack photo array matched the shirt in the single-stand-alone-photo." (Id. at 9.) This allegedly prompted Defendant Mikkelson to contact Plaintiff's parole officer and he "asked the officer to take a photo of Cox, and 'photoshopped' (superimposed)

---

[9] In his Reply to Federal Defendants' Motion to Dismiss, Plaintiff also alleges that Defendant Mikkelson circled Plaintiff's photo in the photo array so Ms. Bacque would identify him. (Dkt. 142 at 16.) Plaintiff does not explicitly allege this in his TAC—he only alleges that Defendant Mikkelson bribed Ms. Bacque to identify him. (Dkt. 107 at 5, 9-11.)

13

Cox's 2008 photo atop Schwark's previously constructed Six Pack [photo lineup] …." (Id. at 10.)  In sum, Plaintiff alleges that Ms. Bacque's photo lineup identification dated November 2, 2005, was altered after she viewed it and now contains a 2008 photo.[10]  Plaintiff alleges that Defendant Mikkelson used the forged and "photoshopped" photo lineup to "convince[] the United States Attorney to file this allegation as Overt Act No. 1." (Id.)

Plaintiff alleges that Defendant Mikkelson's fabrication of evidence violated his rights to due process and equal protection.  (Id.)  Again, however, he acknowledges, "the taint was removed when the District Court removed the loss and victim from being held against Cox." (Id.)

### 4. Count Four: FTCA Claim Against the United States for Failing to Provide Adequate Payment for Investigators.

Through the FTCA, the United States provides a limited waiver of its sovereign immunity by consenting to suit for certain tort claims.[11]  See 28 U.S.C. §§ 1346, 2671 et seq.  Plaintiff alleges an FTCA claim against the United States because "[t]he current system of cutting off funds, and allowing a defendant to beg for additional hours to the Court is inadequate and violates [18 U.S.C.] § 3006A," the statute establishing standards for the representation of indigent criminal

---

[10] Plaintiff declares that he did not cut his moustache in the photographed style until 2008 (Dkt. 107 at 14), and his mother declares that she purchased the shirt Plaintiff is wearing in the photo in 2007.  (Dkt. 142 at 14.)

[11] The FTCA provides that district courts have exclusive jurisdiction over civil actions against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee" of the federal government while acting within the scope of his office or employment, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Constitutional tort claims are not cognizable under the FTCA; the law of the state is the substantive source of liability.  See F.D.I.C. v. Meyer, 510 U.S. 471, 477-78 (1994).

defendants. (Dkt. 107 at 13.) Plaintiff contends, "there should not be a budget limit placed upon investigators where the fund for the prosecution is unlimited." (Id. at 11.) Plaintiff alleges that he needed additional investigator funds to find Ms. Bacque and suffered emotional distress when he borrowed those funds from his mother, because this disrupted his family relationships. (Id. at 11-13.)

Plaintiff clarifies that he is suing to recover both the $6,000 and compensation for his emotional distress. (Dkt. 115 [Notice of Errata].) Plaintiff also seeks an injunction "to prevent [the United States] from using inadequate procedures to cut off defense funding for investigator cost." (Dkt. 107 at 13.) He requests "this Court to order the United States to develop a system which would allow indigent defendants to contest before the revoking of investigator funds during an active search for a witness of which the United States has the ability to find but refuses to do so."[12] (Id.)

**B.      Motions to Dismiss Briefing.**

In his Motion to Dismiss, Defendant Casler argues: (1) the statute of limitations has expired because Plaintiff's § 1983 claims accrued in 2011 (Dkt. 109 at 5-8); (2) Plaintiff's § 1983 claims are barred by Heck v. Humphrey, 512 U.S. 477 (1994) (id. at 8-9); and (3) Defendant Casler did not cause Plaintiff to suffer a deprivation of constitutional rights, because the prosecutor exercised independent judgment in filing a criminal complaint. (Id. at 10-11.)

In their Motion to Dismiss, the Federal Defendants argue: (1) Bivens liability is not recognized in this context and the Court should decline to extend it (Dkt. 133 at 14-17, citing Ziglar v. Abbasi, __ U.S. __, 137 S.Ct. 1843 (2017)); (2) Plaintiff's

---

[12] Plaintiff has since indicated that he wishes to forego his request for monetary damages and to proceed only in seeking an injunction. (See Dkt. 141.) The FTCA, however, only allows claims for monetary damages. 28 U.S.C. § 1346(b)(1). As discussed below, the Court lacks jurisdiction to consider Plaintiff's unexhausted FTCA claim, so it does not reach the issue of remedy.

Bivens claims are barred by the statute of limitations because they accrued in 2011 (id. at 17-18); (3) Plaintiff has failed to state a Bivens claim for due process or equal protection violations (id. at 19-20); (4) Plaintiff's Bivens claims are barred by Heck (id. at 20-21); (5) the Federal Defendants are entitled to qualified immunity (id. at 21-23); and (6) Plaintiff's FTCA claim against the United States fails for failure to exhaust and failure to plead facts sufficient to state a claim. (Id. at 23-26.)

In his oppositions, Plaintiff argues: (1) his claims are not barred by Heck because he could prevail without implying the invalidity of his guilty plea or sentence[13] (Dkts. 117 at 20; 142 at 20); (2) the statute of limitations does not bar his claims because they accrued in 2014 when Plaintiff obtained Ms. Bacque's signed statement, discovered that mall security did not maintain an incident-free vehicle log, and received a clear copy of the photo array (Dkts. 117 at 9; 142 at 11, 14, 47);[14] and (3) he has stated a cognizable due process claim for fabricated evidence (i.e., Ms. Pratt's license plate number and Ms. Bacque's November 2005 identification of Plaintiff) arising under Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."). (Dkts. 117 at 15; 147 at 18.)

---

[13] In other words, Plaintiff admits that none of Defendants' alleged wrongdoing affected the validity of his guilty plea or sentence.

[14] Plaintiff also offers two alternative statute of limitations arguments: (1) his claims accrued in 2014 when the District Judge declined to include in his sentence the incidents associated with Ms. Bacque, thereby eliminating the Heck bar (Dkt. 117 at 13); and (2) Defendants engaged in a conspiracy, so his claim accrued upon their commission of the last overt act in furtherance of the conspiracy, which occurred when Defendant Schwark falsely testified at the 2014 pre-sentencing evidentiary hearing that Ms. Bacque wrote the notation beside Plaintiff's photo on the line-up. (Id. at 21.)

16

## IV.

## LEGAL STANDARDS.

## A.    Elements of Plaintiff's Civil Rights Claims.

Plaintiff alleges civil rights claims against Orange County Sheriff's Detective Casler arising under 42 U.S.C. § 1983 and against federal Secret Service Agents Schwark and Mikkelson arising under Bivens.  (See Dkt. 107.)

"Title 42 U.S.C. § 1983 provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006). "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006). "To state a claim under § 1983 a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted). "A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains].'" Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (emphasis and insertion in original) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)).

Bivens liability operates similarly.  "Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government." Abbasi, 137 S.Ct. at 1854.  "Bivens established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." Carlson v. Green, 446 U.S. 14, 18 (1980) (implying the existence of a Constitution-based damages remedy for a federal prisoner who

alleged jailers failed to treat his asthma in violation of the Eighth Amendment).

Although it is "more limited in some respects," a <u>Bivens</u> action is the "federal

analog" to a § 1983 action against state or local officials. <u>Hartman v. Moore</u>, 547

U.S. 250, 254 n.2 (2006). To assess the validity of a <u>Bivens</u> claim at the pleading

stage, courts must consider (1) whether the plaintiff has alleged facts showing that a

federal actor caused a deprivation of constitutional rights with resulting injury, and

(2) if there are "'special factors counselling hesitation in the absence of affirmative

action by Congress.'" <u>Abbasi</u>, 137 S. Ct. at 1857 (quoting <u>Bivens</u>, 403 U. S. at

396).

**B.     <u>Motions to Dismiss.</u>**

At the pleadings stage, "[t]he court 'accept[s] the plaintiffs' allegations as

true and construe[s] them in the light most favorable to plaintiffs.'" <u>Metzler Inv.</u>

<u>GMBH v. Corinthian Colls., Inc.</u>, 540 F.3d 1049, 1061 (9th Cir. 2008) (citing

<u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 895 (9th Cir. 2002)). A <u>pro</u> <u>se</u> complaint

"must be held to less stringent standards than formal pleadings drafted by lawyers."

<u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007). That said, "the liberal pleading

standard ... applies only to a plaintiff's factual allegations." <u>Neitze v. Williams</u>, 490

U.S. 319, 330 n.9 (1989). "[A] liberal interpretation of a civil rights complaint may

not supply essential elements of the claim that were not initially pled." <u>Bruns v.</u>

<u>Nat'l Credit Union Admin.</u>, 122 F.3d 1251, 1257 (9th Cir. 1997) (quoting <u>Ivey v.</u>

<u>Bd. of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982)).

With respect to a plaintiff's pleading burden, the Supreme Court has held that

"a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do. … Factual allegations must be enough to

raise a right to relief above the speculative level … on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." <u>Bell Atlantic Corp.</u>

<u>v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal citations omitted); <u>see</u> <u>also</u>

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (to avoid dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (internal citation omitted)).

A pro se litigant is entitled to notice of the deficiencies in the complaint and an opportunity to amend, unless it is "absolutely clear" that the complaint's deficiencies could not be cured by amendment. Nordstrom v. Ryan, 762 F.3d 903, 908 (9th Cir. 2014).

**V.**

**DISCUSSION.**

**A.**    **This Court Lacks Jurisdiction Over Plaintiff's Unexhausted FTCA Claim.**

As a prerequisite for federal jurisdiction, the FTCA requires that a claimant first provide to the responsible federal agency written notice of the incident giving rise to the injury, accompanied by a claim for money damages. 28 U.S.C. § 2675(a); 28 C.F.R. § 543.30; Johnson v. United States, 704 F.2d 1431, 1442 (9th Cir. 1983) ("Exhaustion of the claims procedures established under the Act is a prerequisite to district court jurisdiction"). "The requirement of an administrative claim is jurisdictional. Because the requirement is jurisdictional, it must be strictly adhered to. This is particularly so since the FTCA waives sovereign immunity. Any such waiver must be strictly construed in favor of the United States." Brady v. United States, 211 F.3d 499, 502 (9th Cir. 2000) (citations and internal quotation marks omitted). Exhaustion must be affirmatively alleged in the complaint. Gillespie v. Civiletti, 629 F.2d 637, 640 (9th Cir. 1980).

In their Motion to Dismiss Plaintiff's TAC, the Federal Defendants argue, "Notably, Plaintiff does not state that he submitted a tort claim …. Indeed, there is

19

no record of any claim or mail received by the Department of Justice or the Attorney General at any time in November. (See Declaration of Joseph E. Gerstell, ¶¶ 5-8)." (Dkt. 133 at 25.) The Declaration of Mr. Gerstell, an employee of the U.S. Department of Justice, Justice Management Division, indicates that a search of the database revealed no record of any mail sent by Plaintiff. (Id. at 27-28 ¶¶ 7, 8 [Gerstell Declaration].) In his reply, Plaintiff does not contest this. (See Dkt. 142.) Thus, Plaintiff has not and cannot allege compliance with the exhaustion conditions set forth by the FTCA. This Court lacks jurisdiction over Plaintiff's "Count Four."

**B.** **Plaintiff Does Not Allege that Defendants' Evidence Fabrication Caused a Deprivation of His Liberty or Property.**

"In a § 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008). A plaintiff does not satisfy this standard with a showing of "mere causation in fact"; a plaintiff must also show proximate causation, which entails "foreseeability." Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Stevenson v. Koskey, 877 F.2d 1435, 1438 (9th Cir. 1989) (noting that federal courts turn to common law of torts for causation in civil rights cases). "Like in any proximate cause analysis, an intervening event may break the chain of causation between the allegedly wrongful act and the plaintiff's injury." Caldwell v. City & County of San Francisco, 889 F.3d 1105, 1115 (9th Cir. 2018). Additionally, a defendant's conduct cannot be considered the proximate cause of the plaintiff's injury if the connection between the constitutional violation and the injury is too remote. Martinez v. State of Cal., 444 U.S. 277, 285 (1980).

"The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." Leer, 844 F.2d at 633. In his

oppositions, Plaintiff clarifies that his due process claims arise under <u>Devereaux</u>, 263 F.3d at 1074-76. (Dkts. 117 at 15; 147 at 18.) Plaintiff argues that the actions of Defendants Casler, Schwark, and Mikkelson violated his "constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." <u>Devereaux</u>, 263 F.3d at 1074-75. (Dkts. 117 at 4; 143 at 2.) Plaintiff's equal protection claims are inextricably linked to his <u>Devereaux</u> claims, because Plaintiff alleges that Defendants fabricated evidence to implicate Plaintiff motivated by racial animus.

In <u>Devereaux</u>, the plaintiff filed a § 1983 suit against investigators after allegedly coercive interviews with his foster children culminated in sexual abuse allegations and felony charges; the plaintiff was never convicted but pled guilty to misdemeanor offenses. 263 F.3d at 1073-74. The Ninth Circuit held that to raise a deliberate-fabrication-of-evidence claim, a plaintiff must at minimum point to circumstantial evidence that either: "(1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information."[15] <u>Id.</u> at 1076. The Ninth Circuit never reached the issues of causation and injury, affirming summary judgment to defendants because the plaintiff did not allege facts showing evidence fabrication. <u>Id.</u> at 1078, 1080.

Since <u>Devereaux</u>, the Ninth Circuit has recognized that "fabricated evidence does not give rise to a claim if the plaintiff cannot show the fabrication actually injured her in some way."[16] <u>Spencer v. Peters</u>, 857 F.3d 789, 798 (9th Cir. 2017)

---

[15] In addition to presenting circumstantial evidence of fabrication, a plaintiff can present direct evidence of fabrication. <u>Costanich v. Dep't of Soc. & Health Servs.</u>, 627 F.3d 1101, 1111 (9th Cir. 2010); <u>Caldwell</u>, 889 F.3d at 1112-14.

[16] Plaintiff argues that he need not allege injury because a court may award nominal damages when a constitutional violation occurs. (Dkt. 117 at 15-16, citing

(citations and internal quotations omitted).  Because a <u>Devereaux</u> claim arises from the Due Process Clause, <u>Devereaux</u>, 263 F.3d at 1074-75, the actionable injury is "a government deprivation of life, liberty, or property."  <u>Costanich</u>, 627 F.3d at 1110 (citation omitted) (assuming that revocation of plaintiff's foster care license in termination proceedings constitutes a due process injury).

With an actionable deprivation, "[t]o prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication <u>caused</u> the plaintiff's deprivation of liberty."[17]  <u>Id.</u> (emphasis added).  "To establish the second element of causation, the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the proximate cause or legal cause of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question."  <u>Id.</u>

In <u>Spencer</u>, a detective falsely reported claims of child abuse—detailed, explicit, and in quotations erroneously attributed to the child—leading plaintiff to

---

<u>Hazle v. Crofoot</u>, 727 F.3d 983, 991 n.6 (9th Cir. 2013).)  However, <u>Hazle</u>, and the Supreme Court case <u>Hazle</u> cites, were not considering the adequacy of claims at the pleading stage.  Rather, in those cases, the district judge had already found at trial that defendants violated plaintiff's constitutional rights; despite the finding, the court did not award any damages.  <u>Hazel</u>, 727 F.3d at 989-90; <u>Carey v. Piphus</u>, 435 U.S. 247, 266-67 (1978) ("when a defendant is found to have violated an individual's right to procedural due process, the plaintiff is 'entitled to recover nominal damages,' even 'without proof of actual injury.'").  Here, to state a <u>Bivens</u> or § 1983 <u>Devereaux</u> claim, Plaintiff must allege facts showing that the evidence fabrication caused him injury.  <u>See Spencer</u>, 857 F.3d at 798.  Without alleging facts showing causation and injury, Plaintiff fails to state a claim.

[17] Although <u>Spencer</u> discusses the deprivation of liberty as the pertinent injury, the case to which <u>Spencer</u> cites, <u>Costanich</u>, recognizes "deprivation of a protected liberty or property interest" as cognizable injuries.  627 F.3d at 1114, 1115, 1116.

22

enter an <u>Alford</u>[18] plea and spend nearly two decades in prison. <u>Id.</u> at 799.
Defendants argued that they did not cause plaintiff's confinement because
intervening events—such as non-fabricated evidence and his plea—rendered the
injury too attenuated. <u>Id.</u> at 801. The Ninth Circuit, however, found the record
supported the jury's finding that the fabrication caused the injury; without the
fabricated evidence, scant evidence of guilt existed, and even with the fabricated
evidence, two prosecutors independently opposed bringing charges. <u>Id.</u>

Plaintiff alleges four potential injuries resulting from Defendants' alleged
fabrication of evidence: Plaintiff's (1) prosecution in the Criminal Case (Dkt. 143);
(2) erroneous sentence (Dkt. 151); (3) $6,000 investigator expenditure (Dkt. 107);
and (4) emotional distress.[19] (<u>Id.</u>) As discussed below, Plaintiff cannot allege facts
showing that Defendants' alleged fabrication of evidence caused any actionable
injury.

### 1. Prosecution in the Criminal Case.

a. Evolution of the Criminal Case against Plaintiff.

The Criminal Case began in 2009 with the indictment of Tritia Black, a Bank
of America employee, for conspiracy to commit bank fraud. (Criminal Case, Dkt.

---

[18] <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970) (finding the court committed
no error in accepting defendant's guilty plea despite his claim of innocence).

[19] In his TAC, Plaintiff alleged injuries of emotional distress and monetary
loss. (<u>See</u> Dkt. 107.) On September 12, 2018 Plaintiff filed supplementary briefing
clarifying his claims and addressing the issue of causation. (Dkt. 143.) There,
Plaintiff seems to reframe his injury as one of prosecution—specifically, he was
injured because he was forced to defend himself against charges based on
fabricated evidence. (<u>Id.</u>) Then, in his objections to the initial R&R, Plaintiff
reframes his injury as one of sentencing error. (Dkt. 151.) Although the TAC itself
must supply the essential elements of a claim on which relief may be granted,
<u>Bruns</u>, 122 F.3d at 1257, the Court considers this new, unpled theory of injury for
the sake of affording Plaintiff the benefit of any doubt, <u>Karim-Panahi v. Los
Angeles Police Dep't</u>, 839 F.2d 621, 623 (9th Cir. 1988), and demonstrating that
further leave to amend would be futile.

1.)  The indictment charged that Ms. Black provided confidential account information to co-conspirators in exchange for money.  (Id.)  The co-conspirators used the stolen account information to order checks and then recruited "runners" to cash forged checks.  (Id.)  Ms. Black entered a guilty plea in 2010.  (Criminal Case, Dkt. 19.)  In 2011, Plaintiff and more than a dozen others were indicted.  (Criminal Case, Dkt. 30.)  The First Superseding Indictment alleges that Plaintiff obtained stolen account information from Ms. Black and other bank employees.  (Id. at 6.)  On February 16, 2011, Plaintiff pled "not guilty" to every charge against him in the First Superseding Indictment.  (Criminal Case, Dkt. 95.)

In October 2011, the grand jury issued a Second Superseding Indictment.  (Criminal Case, Dkt. 403.)  Plaintiff was charged with (1) Count One (conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349); (2) Counts Two through Forty-Two (bank fraud in violation of 18 U.S.C. § 1344), (3) Counts Forty-Four, Fifty-Three, Fifty-Five, Fifty-Eight, Sixty-Two, Seventy-Seven, and Eighty-Four through Ninety-One (aggravated identity theft in violation of 18 U.S.C. § 1028A(a)); and (4) Count One Hundred Five (felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1)).  Plaintiff initially pled "not guilty."  (Criminal Case, Dkt. 434.)

On December 16, 2011, Plaintiff pled "guilty" to seventeen counts: (1) Count One (conspiracy), (2) Count Twenty-Three (bank fraud), (3) Counts Forty-Four, Fifty-Three, Fifty-Five, Fifty-Eight, Sixty-Two, Sixty-Seven,[20] Eighty-Four through Ninety-One (identity theft), and (4) Count One Hundred Five (felon in possession of firearm).  (Criminal Case, Dkts. 521 [minutes of change of plea hearing]; 674 [transcript, RT 12/16/11] at 30 (indicating that all other counts against Plaintiff

---

[20] Count Sixty-Seven was dismissed at sentencing because Plaintiff was not charged in that count.  (See Criminal Case, Dkt. 1476 [6/30/14 RT Sentencing Proceedings] at 22.)

would be dismissed at sentencing); 1476 [6/30/14 RT Sentencing Proceedings] at 16-22 (reading charges at sentencing).)  In this civil action, Plaintiff does not contest his guilt.[21]

> b. Causation Analysis.

As an initial matter, Defendant Casler argues that a presumption applies here that the prosecutor exercised independent judgment in instigating a prosecution against Plaintiff based on probable cause, and Plaintiff has not rebutted this presumption; because the presumption stands, Defendants are immunized from liability for injuries allegedly caused by their pre-filing misconduct.  (Dkt. 109 at 10-11.)

Where a prosecutor has filed a criminal complaint, a rebuttable presumption arises that the prosecutor "'exercised independent judgment in determining that probable cause … existed,' thereby breaking the 'chain of causation between an arrest and prosecution' and immunizing 'investigating officers from … damages suffered' after the complaint was filed."  Beck v. City of Upland, 527 F.3d 853, 862 (9th Cir. 2008) (citing Smiddy v. Varney, 665 F.2d 261, 266-67 (9th Cir. 1981)).  In other words, the prosecutor's independent decision operates as "superseding or intervening cause."  Id.  Thus, "in any constitutional tort case … in which a prosecutor has instigated a prosecution, it is necessary, if not sufficient, that a plaintiff seeking to sue non-prosecutorial officials alleged to be responsible post-complaint for the arrest or prosecution show the absence of probable cause."  Id. at 865.  The plaintiff may rebut this presumption by, for example, showing that "the prosecutor was pressured by police or was given false information."  Id.  at 862.

---

[21] See e.g., Dkt. 117 at 8-9 ("Indeed, it is not necessary for Cox's guilty plea to be invalid due to removing the fabricated identification of Cox by Bacque. … although he committed a crime, he always believed America was a country of fairness …."); id. at 10 ("Cox disputes that Bacque alone invalidates his guilty plea by rendering it involuntary or without a factual basis.").

1    Recently, the Ninth Circuit declined to decide whether the causation-

2    breaking presumption applies to Devereux claims.  Caldwell, 889 F.3d at 1115-16.

3    In Caldwell, the plaintiff argued, "because deliberate fabrication of evidence cases

4    are not dependent on finding a lack of probable cause, no presumption should be at

5    play."  Id. at 1115.  Assuming—without deciding—that the presumption applied,

6    the Court held that plaintiff had rebutted it because "if a plaintiff establishes that

7    officers either presented false evidence to or withheld crucial information from the

8    prosecutor, the plaintiff overcomes the presumption of prosecutorial independence

9    and the analysis reverts back to a normal causation question."  Id. at 1116.

10    This Court need not resolve now whether the causation-breaking

11    presumption applies.  Even assuming (without deciding) that the causation-breaking

12    presumption does not apply to Plaintiff's Devereaux claims and that Plaintiff need

13    not rebut it, other causation issues defeat Plaintiff's claims.  Specifically, Plaintiff

14    must allege—but fails to allege—facts showing that the fabricated evidence was the

15    cause-in-fact and proximate cause of the deprivation of some liberty or property

16    interest.  Spencer, 857 F.3d at 798, 800; Costanich, 627 F.3d at 1114-16.

17    Plaintiff frames his prosecution-related injury as being forced to defend

18    himself against charges based on fabricated evidence.  (Dkt. 143.)  Relying on

19    Caldwell, Plaintiff argues, "[Caldwell] teaches, that it is the charge itself, under

20    circumstances of deliberate fabrication, that satisfies the causation requirement that

21    a due process violation deprives a person of 'liberty.'"  (Id. at 2.)  In Caldwell the

22    Ninth Circuit recognized, "[a]s to what constitutes an injury, a § 1983 plaintiff need

23    not be convicted on the basis of the fabricated evidence to have suffered a

24    deprivation of liberty—being criminally charged is enough."  889 F.3d at 1115

25    (citing Devereaux, 263 F.3d at 1074-75 and Ninth Cir. Jury Instr. Comm., Manual

26    of Model Civil Jury Instructions, § 9.33 (2017) ("The defendant [name] deliberately

27    fabricated evidence that was used to [[criminally charge] [prosecute] [convict]] the

28    plaintiff.")).  In Caldwell, plaintiff was incarcerated for twenty years for murder

until his writ of habeas corpus was granted for ineffective assistance of counsel; plaintiff sued the investigating officers upon his release for alleged evidence fabrication. 889 F.3d at 1108 & n.1. Here, however, Plaintiff cannot allege that he suffered a deprivation of liberty because of the alleged evidence fabrication.

To the extent Plaintiff argues that he never would have been prosecuted for *any* crimes but for Defendant Casler lying to Defendant Schwark about receiving Plaintiff's ex-wife's license plate number from South Coast Plaza's security, that argument fails. Even if Defendant Casler wanted to implicate Plaintiff by feeding Defendant Schwark fabricated information, he could not have known the license plate number of Plaintiff's ex-wife's car before it was issued.[22] Alternatively, if Defendant Schwark lied about when he learned the plate number from Defendant Casler (in other words, if they agreed to fabricate the story about spotting Plaintiff's ex-wife's car in the mall parking lot *after* Plaintiff was already a suspect), then the fabricated story did not cause Plaintiff to become a suspect. Either way, Plaintiff has not alleged facts plausibly showing that any false statements about his ex-wife's license plate number led to his arrest and prosecution. To the contrary, the testimony of Defendants Schwark and Mikkelson at the pre-sentencing evidentiary

_____

[22] In objecting to the initial R&R, Plaintiff disputes this understanding. (Dkt. 151 at 12.) Plaintiff states that he bought the car used, so the license plate had been issued before his purchase, presumably to the prior owner; the dealer was holding this plate until Plaintiff paid the balance on the car, and in the meantime, Plaintiff and his ex-wife drove the car with paper plates from the dealer. (Id.) This does not change the above statement. It remains entirely unclear how Defendant Casler could have obtained the plate number—which Defendant Schwark was able to trace to Plaintiff's ex-wife's Mercedes via the Secret Service database—if the plate had been issued to a different owner and remained with the dealer. Even assuming arguendo Defendant Casler obtained the plate number by illicit means and fed the number to Defendant Schwark to implicate Plaintiff, Plaintiff has not shown that this caused him any injury; with independent evidence tying him to the scheme, Plaintiff does not, and cannot, point to any charges he would not have faced but for the license plate identification.

hearings show that several independent sources—such as interviews and wiretaps—revealed Plaintiff's participation in the scheme. (See Criminal Case, Dkts. 1427, 1429, 1475.) Thus, Plaintiff cannot allege facts showing that but for the fabricated license plate sighting, he would have evaded prosecution.

To the extent Plaintiff alleges that fabricated evidence caused him a more limited prosecution-related injury—i.e., that he never would have faced charges for the incidents involving Ms. Bacque but for Defendants' coercion of Ms. Bacque's false identification—that allegation also fails. The operative Second Superseding Indictment charged Plaintiff and thirteen co-defendants in one hundred and five counts. (See Criminal Case, Dkt. 403.) The incidents associated with Ms. Bacque appear only in two places: (1) in two of the one hundred and sixty-one Overt Acts underlying Count One [23] (conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349), and (2) in Counts Two and Three[24] (bank fraud in violation of 18 U.S.C. § 1344.)

First, Plaintiff cannot show that but for Ms. Bacque's false identification, he would not have been prosecuted for violating § 1349, conspiracy to commit bank fraud (Count One). The text of § 1349 does not include an overt act requirement.

---

[23] Overt Acts One and Two allege that on May 16, 2005, Plaintiff gave a co-conspirator a fraudulent check written on the Bank of America account of victims J.V. and T.V.; on that same day, another co-conspirator, J.B., cashed it. (Criminal Case, Dkt. 403 at 8.) This describes the first incident involving Ms. Bacque and the two men in the white Jaguar.

[24] Count Two alleges that on May 16, 2005, the co-defendants cashed an unauthorized check, payable to Ms. Bacque, from the Bank of America account of victims J.V. and T.V. (Criminal Case, Dkt. 403 at 35.) Count Three alleges that on May 23, 2005, the co-defendants cashed an unauthorized check, payable to Ms. Bacque, from the Bank of America account of victim L.B. (Id. at 36.) Plaintiff did not plead guilty to Count Two or Three. (See Criminal Case, Dkt. 674 [plea hearing transcript, RT 12/16/11] at 30 (prosecutor indicating that all counts to which Plaintiff did not plead guilty would be dismissed without prejudice at sentencing).)

In a similar context, the Supreme Court held that conviction under a conspiracy statute did not require proof of an overt act because the statute's text did not explicitly require such proof.  Whitfield v. United States, 543 U.S. 209, 219 (2005). Although the Ninth Circuit has not yet decided whether conviction under § 1349 requires proof of an overt act, most Circuits have held it does not.[25]  See United States v. Hussain, 2018 WL 3619797, 2018 U.S. Dist. LEXIS 127288, at *108 (N.D. Cal. July 30, 2018) (recognizing the Ninth Circuit has not yet decided this issue but finding that conviction under § 1349 does not require proof of an overt act).  If indictment, prosecution, and conviction for a violation of § 1349 do not require proof of an overt act, then fabricated evidence of an overt act cannot cause a wrongful prosecution.[26]  And even if it could, here, one hundred and fifty-nine other overt acts underlie Count One, a § 1349 charge, to which Plaintiff pled guilty and does not contest his guilt.  Thus, Plaintiff cannot show that but for Ms. Bacque's false identification, he would not have been prosecuted under §1349.

Second, Plaintiff cannot show any injury arising from the Second Superseding Indictment's inclusion of Counts Two and Three—bank fraud charges based on the incidents involving Ms. Bacque.  The Second Superseding Indictment names all fourteen co-defendants as having executed a bank fraud scheme; this

---

[25] See, e.g., United States v. Roy, 783 F.3d 418, 420 (2d Cir. 2015); United States v. Pascacio-Rodriguez, 749 F.3d 353, 363, 364 n.49 (5th Cir. 2014); United States v. Rogers, 769 F.3d 372, 380-82 (6th Cir. 2014); United States v. Fishman, 645 F.3d 1175, 1186 (10th Cir. 2011); United States v. Eason, 579 F. App'x 807, 810 n.3 (11th Cir. 2014); United States v. Chinasa, 489 F. App'x 682, 685-86 (4th Cir. 2012).

[26] Plaintiff recognizes that prosecution for a violation of § 1349 does not require any overt acts, arguing in his reply briefing, "the only way [Plaintiff's] claim could invalidate his guilty plea is if true it amounts to a manifest injustice, but because a overt act is not needed for the conviction under § 1349, and [Plaintiff] did not plead guilty to Overt Act No. 1, a manifest injustice would not result."  (Dkt. 142 at 30.)

scheme encompasses forty-one counts under § 1344, including Counts Two and Three, and none of the defendants are personally named in any of these counts. Certainly, each co-defendant did not personally participate in each count. Plaintiff cannot argue that but for Ms. Bacque's identification of him, Counts Two and Three would not be included in the operative Second Superseding Indictment; Ms. Bacque unwaveringly identified "Homicide," who was charged as a participant in the scheme. Besides the conspiracy and bank fraud charges—which name all fourteen co-defendants—Plaintiff was only charged with and only pled guilty to acts that occurred in or after 2009, long after Ms. Bacque's 2005 involvement. (Id.)

Therefore, Defendants' alleged fabrication of evidence did not cause Plaintiff to confront any criminal charges that he would not have otherwise confronted. Plaintiff fails to allege that Defendants' fabrication of evidence caused him any harm in the form of prosecution.

### 2. Sentencing Error.

In objecting to the initial R&R, Plaintiff reframed his injury as one of sentencing error. (Dkt. 151 at 1-10, 13-16, 21-22.) Plaintiff argues as follows: "[Plaintiff] did indeed, receive a higher guideline range which resulted in a higher sentence through the District Court's error, which if-not-but-for the deliberately fabricated evidence, the District Court would not have erred." (Id. at 1.) Plaintiff alleges that the District Judge erred in calculating the restitution amount (id. at 3-4, 7-9, 14-15), calculating the number of victims (id. at 3, 8-9, 14), and making the relevant conduct finding. (Id. at 5-6, 9-10.) Plaintiff argues that this constitutes a deprivation of his liberty and property. (Id. at 15.)

This argument, however, fails to justify granting Plaintiff further leave to amend his civil rights claims against Defendants. Any such civil rights claim would be precluded by Heck v. Humphrey. Heck holds as follows:

> A claim for damages bearing that relationship to a conviction or *sentence* that has not been so invalidated is not cognizable under § 1983. Thus, when a

state prisoner seeks damages pursuant to § 1983, the district court must
consider whether a judgment in favor of the plaintiff would necessarily imply
the invalidity of his conviction or sentence; if it would, the complaint must be
dismissed unless the plaintiff can demonstrate that the conviction or sentence
has already been invalidated.

512 U.S. 477 at 487 (emphasis added). "[T]he rationale of Heck applies to Bivens
actions." Martin v. Sias, 88 F.3d 774, 775 (9th Cir. 1996). The invalidity of
Plaintiff's sentence is necessary to his damages claim because without its invalidity
Plaintiff suffers no deprivation and thus no injury; as such, this claim is not
cognizable under Heck.

Plaintiff addresses Heck, arguing, "there isn't a Heck v. Humphrey Bar,
because the [District] Court actually previously removed the loss and victim, but
erred, in readjusting its relevant conduct finding, which is the proximate causation
of the deliberately fabricated evidence, and a violation of [Plaintiff's] liberty
interests." (Dkt. 151 at 10.) In other words, Plaintiff agrees that the District Judge
intended to remove from his sentence the victim count and loss amount associated
with the allegedly fabricated evidence, but in doing so made an "independent
mistake" resulting in a "2 offense level increase." (Id. at 14-15.)

Even if the District Judge *inadvertently* included in Plaintiff's sentence some
victims or monetary loss predating 2009 (which Plaintiff cannot show), Plaintiff
could not escape the Heck bar. To the extent Plaintiff proposes to allege sentencing
errors tied to the allegedly fabricated evidence, Plaintiff's success in this action
would necessarily imply the invalidity of his sentence and thus contravene Heck.
To the extent Plaintiff proposes to allege sentencing errors unrelated to the
allegedly fabricated evidence (i.e., "independent mistake"), Plaintiff could not show
that the evidence fabrication *caused* his deprivation of liberty.

In any event, this new argument is plainly contrary to Plaintiff's allegations
in the TAC. In the TAC, Plaintiff alleges, "[t]hese acts of corruption involving

racial animus and due process violations were constitutional violations, and violations of clearly established federal law, but however, the taint was removed when the District Court removed the loss and victim from being held against [Plaintiff]. … the District Court did what it believed was its fair judgement and removed the loss and victim." (Id. at 10.)  In other words, "[Plaintiff] therefore admits that the taint from the fabricated evidence was removed, but the constitutional violations remained." (Id. at 9.)  In deciding a motion to dismiss, the Court looks to the pleadings to define the claims.[27]

Finally, the Court notes that claims alleging sentencing error and seeking a modified sentence are more appropriately brought on direct appeal in the Criminal Case or in a petition for a writ for habeas corpus.[28]  See Preiser v. Rodriguez, 411 U.S. 475, 500 (1973).

### 3. Investigator Expenditure.

Plaintiff alleges that Defendants' conduct caused him harm because it compelled his mother to spend $6,000 on an investigator, which he later repaid. (Dkt. 107 at 11-13.)  In his oppositions, Plaintiff argues as follows: knowing the maximum amount the government contributes to an indigent defendant's defense,

---

[27] In his objections to the initial R&R, Plaintiff requests that the Court dismiss this action without prejudice so that Plaintiff can "pursue civil rights remedy after his criminal case is overturned and the conviction is vacated and dismissed …." (Dkt. 151 at 17.)  Generally, when Heck precludes a plaintiff's claims, the action is dismissed without prejudice, so the claims can be reasserted if the conviction is invalidated.  Trimble v. City of Santa Rosa, 49 F.3d 583, 585 (9th Cir. 1995.)  The dismissal of the claims actually pled in this case, however, is not based on Heck.  Heck is discussed as the basis for denying Plaintiff further leave to amend.

[28] Plaintiff already raised on direct appeal that the District Judge erroneously calculated his sentence; the Ninth Circuit did not find error.  (See Case Nos. 14-50325, 15-50453 & 16-50415, Dkts. 70 [Appellant's Opening Brief], 137-1 [memorandum affirming judgment].)

Defendants fabricated evidence in a strategic effort to overwhelm Plaintiff's defense and exhaust his funds (Dkt. 117 at 15); Defendants' evidence fabrication caused Plaintiff to seek Ms. Bacque (id. at 24); this search caused Plaintiff's first investigator, Mr. Noohi, to "run[] up an extremely high bill" (id.); this high bill caused the United States to cut off investigator funds (id.); when funds were cut off, Plaintiff's mother located Ms. Bacque via social media and asked Mr. Noohi to investigate, but he refused to accept money from Plaintiff (Dkt. 142 at 27); as a result, Plaintiff's mother spent $2,500 to hire a second investigator, Ms. Spada, and Plaintiff requested an additional 35 funded hours from the Court (Dkt. 117 at 15); the District Judge declined to authorize further expenditures before seeing Ms. Spada's work product (id. at 13);[29] consequently, Plaintiff borrowed additional funds from his mother, which he eventually repaid, so that Ms. Spada could obtain a signed statement from Ms. Bacque. (Id.)

It is unclear that this expenditure constitutes an injury. Plaintiff's family voluntarily spent $6,000 to hire a defense investigator and received the benefits of her investigation. By the time Plaintiff requested that the Court provide additional funds, Plaintiff's mother had already spent $2,500, and Ms. Spada had already located and interviewed Ms. Bacque; thereafter, Plaintiff never renewed his request for funding. Moreover, if Plaintiff had $6,000 available to reimburse his mother,

---

[29] In objecting to the initial R&R, Plaintiff argues that the Court inaccurately construed the hearing at which Ms. Spada's funding was discussed because the District Judge "never offered reimbursement, but instead required [Plaintiff] to present Bacque on his own funds …." (Dkt. 151 at 17.) "[Plaintiff] invites this Court to point in the record where possible reimbursement was discussed." (Id. at 18.) To clarify, the Court does not represent that the District Judge ever offered to reimburse Plaintiff or his mother for the funds paid to Ms. Spada before the hearing ($2,500), and Plaintiff did not request this reimbursement at the hearing. (Criminal Case, Dkt. 1556.) Rather, Plaintiff requested 35 additional funded hours, and the District Judge stated that he wanted to hear from the witnesses Ms. Spada had already located "before I then open up a checkbook again." (Id. at 26.)

then it is unclear that Plaintiff was entitled to funds under § 3006A, which provides funds only to those otherwise unable to fund their own defense.[30]

Assuming arguendo that the expenditure constitutes an injury, a link-by-link examination of the causation chain alleged by Plaintiff reveals multiple fatal flaws in Plaintiff's theory of causation. As discussed above, the causation element of a civil rights claim requires both cause-in-fact and proximate causation; a plaintiff cannot establish that a defendant's conduct proximately caused him harm when the harm is too remote or when intervening events break the causal chain. See Martinez, 444 U.S. at 285 (finding the harm too remote in a § 1983 suit against parole board where parolee killed someone five months after the board authorized his release).

According to Plaintiff, the links of the chain of causation connect as follows: (1) Defendants coerced Ms. Bacque to identify Plaintiff falsely, so (2) Plaintiff's investigator tried to locate Ms. Bacque to interview her, but he ran out of court-authorized funds before completing that task, so (3) Plaintiff's mother paid a private investigator, so (4) Plaintiff applied for to the Court for additional funding, so (5) the Court denied that request without prejudice, asking to see Ms. Spada's work product before authorizing additional funding, but (6) Plaintiff never renewed his request, instead choosing to use his own money to reimburse his mother. (See Dkt. 117 at 13, 15, 24.)

Plaintiff has not sufficiently alleged that Ms. Bacque's coerced identifications proximately caused the $6,000 investigator expenditure. The 2014 expenditure is too remote a consequence of the alleged fabrication; with the exception of the allegations against Defendant Mikkelson, the alleged events

---

[30] Even so, the Ninth Circuit has held that an indigent defendant is not necessarily entitled to payment of an investigator's bill under § 3006A. United States v. Barger, 672 F.2d 772 (9th Cir. 1982); Bonin v. Calderon, 59 F.3d 815 (9th Cir. 1995).

occurred in 2005—nearly a decade before the alleged harm.  Remoteness aside, several intervening events disrupt the causal chain: (1) Mr. Noohi ran up a bill of $60,000 without finding key witnesses, including Ms. Bacque, whom Plaintiff's mother found on social media (Criminal Case, Dkt. 1556 at 20-21; Dkt. 142 at 27); (2) the District Judge initially declined to provide additional funds; and (3) Plaintiff never reintroduced his request for funds supported by Ms. Spada's work product, as the District Judge instructed him to do.  With all of these intervening events, Plaintiff cannot allege facts showing that Defendants proximately caused the $6,000 investigator expenditure.  Instead, the most proximate cause of Plaintiff's failure to obtain additional  investigator funds from the District Court was his own decision not to renew his request based on Ms. Spada's work product.  (Criminal Case, Dkt. 1556 [6/13/14 RT] at 21-22.)

### 4. Emotional Distress.

Plaintiff alleges that he suffered emotional distress caused by the disruption of his family relationships; this, in turn, was caused by Plaintiff's borrowing $6,000 from his mother for investigator fees.  (Dkt. 107 at 11.)  As discussed above concerning the investigator expenditure, Plaintiff cannot allege that Defendants' conduct proximately caused his emotional distress; this harm is far too attenuated. Plaintiff's alleged emotional injury is even further down the causal chain away from Defendants' actions than the expenditure—and was thus less foreseeable, more remote, and more disrupted by intervening events.

In any event, emotional distress does not constitute a cognizable Devereaux injury.  A Devereaux claim arises from the Due Process Clause.  Devereaux, 263 F.3d at 1074-75.  In evaluating the injury component of a Devereaux claim, the Ninth Circuit held: "'[T]o establish a substantive due process claim a plaintiff must ... show a government deprivation of life, liberty, or property.'  Therefore, before turning to the question of whether [plaintiff's] due process rights were violated, we must first determine whether there has been a deprivation of life, liberty, or

property." <u>Costanich</u>, 627 F.3d at 1110 (citation omitted) (assuming that revocation of plaintiff's foster care license in termination proceedings constitutes a due process injury). Emotional distress does not implicate any protected liberty or property interest and thus does not suffice to allege injury under <u>Devereaux</u>.

## C. **Plaintiff Cannot Obtain Injunctive Relief as a Remedy for the Alleged Violations of His Civil Rights.**

On September 4, 2018, this Court docketed Plaintiff's additional response to the Federal Defendants' Motion to Dismiss, in which he "seeks to drop the claim for monetary damages, and proceed only on the claim for an injunction." (Dkt. 141 at 1.) Plaintiff "seeks only to obtain a remedy for individuals whom are prosecuted by the United States and their indigent funds are cut-off for investigators during critical portions of the proceedings in their criminal case." (<u>Id.</u>)

A party seeking injunctive relief must show "a very significant possibility of future harm" to him or herself.[31] <u>Montana Shooting Sports Ass'n v. Holder</u>, 727 F.3d 975, 979 (9th Cir. 2013) (quoting <u>Mortensen v. County of Sacramento</u>, 368 F.3d 1082, 1086 (9th Cir. 2004), <u>Bras v. Cal. Pub. Utils. Comm'n</u>, 59 F.3d 869, 873 (9th Cir. 1995)). Plaintiff cannot show a very significant possibility that in the future, he will be prosecuted by the United States and have his investigator funding cut off during a critical portion of the proceedings. Moreover, this Court lacks jurisdiction over Plaintiff's FTCA claim against the United States, and the remaining civil rights Defendants could not provide this relief.

---

[31] Plaintiff lacks standing to seek injunctive relief on behalf of others because standing requires a showing that plaintiff faces a real and immediate threat of being wronged again. <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95 (1983). Additionally, because Plaintiff is <u>pro se</u>, he cannot pursue relief on behalf of others. <u>Simon v. Hartford Life, Inc.</u>, 546 F.3d 661, 664 (9th Cir. 2008).

**D.    Plaintiff's Outstanding Requests.**

   **1.  Plaintiff's Request to Amend His TAC.**

On June 7, 2018, the Court received from Plaintiff a document entitled: "Request to amend the complaint adding a request for Spoliations Sanctions against the United States, for concealing or destroying evidence useful in this suit. (Adding AUSA Joseph T. McNally BIVENS)." (Dkt. 113.)  Plaintiff requests to amend his TAC to assert a claim for "Spoliation Sanctions" against the following individuals: (1) an "unknown individual tasked with maintaining the origin and date of [a] photo used" in a six-pack photo line-up in Plaintiff's underlying Criminal Case, and (2) an Assistant United States Attorney named Joseph McNally who prosecuted Plaintiff in the Criminal Case.  (Id. at 1, 3-4.)  Plaintiff asserts wrongdoing in connection with a Freedom of Information Act ("FOIA") request that he submitted relating to that line-up photo.  (Id. at 1.)  He argues that the United States of America has "stall[ed]" in responding to that request, and has not produced the photo, but has claimed that it will "continue to search ...."  (Id. at 2.)

Plaintiff included with the request three letters from the Executive Office for United States Attorneys ("EOUSA"): (1) dated January 2, 2018, indicating that the EOUSA needed additional information to process his request "FOIA-2018-000445" (id. at 8); (2) dated April 3, 2018, acknowledging the receipt of FOIA request "EOUSA-2018-002770" (id. at 11); and (3) dated April 25, 2018, indicating that the United States Attorney's Office(s) for the Southern District of California did not have the records for request "EOUSA-2018-002770" and advising Plaintiff, if he is not satisfied, to administratively appeal his request or contact the FOIA Public Liaison.  (Id. at 10.)  Plaintiff also included a letter from the Office of Information Policy, dated May 23, 2018, indicating that the Office could not consider his administrative appeal because the EOUSA had not yet made an adverse determination regarding his FOIA request; this letter advised that FOIA authorizes requesters to file a lawsuit when an agency takes longer than the statutory time

period to respond.  (Id. at 12, citing 5 U.S.C. § 552(a)(6)(C)(i).)  On June 12, 2018 the Court stayed Plaintiff's request for leave to amend.  (Dkt. 114.)

On July 11, 2018, the Court received a document entitled "Request to add 15 questions to both James Mikkelson, and Wesley Schwark's interrogatories. Renewed requests for discovery from the United States." (Dkt. 125.)  Plaintiff stated that the EOUSA would not fulfill his requests and indicated that "[i]t appears more stall tactics are at play, and the only way to prevent the continued stonewalling is if this Court would order full disclosure ...." (Id. at 1-2.)  Plaintiff included with this filing a letter dated June 18, 2018, from the Department of Homeland Security, referencing "File Number 20180836" and stating that any responsive records "have been located and forwarded ... for review and a disclosure determination." (Id. at 5.)  He also attached a letter dated June 1, 2018, from the EOUSA referencing "EOUSA-2018-003418" and stating that "[a]ll of the records you seek are being made available to you" and claiming a "full release." (Id. at 3.)

On October 31, 2018, the Court received from Plaintiff a letter entitled: "Notice to the Court that despite the Court's invite to explain why Cox's freedom of information act request is delayed 9 months Homeland Security failed to turn over documents." (Dkt. 148.)  Plaintiff included with the filing a letter from the Department of Homeland Security dated August 23, 2018, indicating that documents responsive to Plaintiff's request (File Number 20180836) have been located and will be released to Plaintiff upon the completion of processing; because of an increasing number of FOIA requests, there might be a delay in processing. (Id. at 3.)  In this filing, Plaintiff requests $450,000 in spoliations sanctions for lack of compliance with FOIA.  (Id. at 2.)

Plaintiff's request for leave to amend is denied because (a) spoliation sanctions are inappropriate here, and (b) granting leave to amend would be futile.

a.  Spoliation Sanctions.

District courts have discretionary power under Federal Rule of Civil

Procedure 37 to sanction a party for the spoliation of evidence.  Ingham v. United States, 167 F.3d 1240, 1246 (9th Cir. 1999).  However, Plaintiff's request for spoliation sanctions appears to stem from his FOIA requests, and a FOIA request may not be enforced through a discovery motion.  Thus, Plaintiff's request for spoliation sanctions falls outside the scope of Rule 37.

Even so, "[t]o be actionable, the spoliation of evidence must damage the right of a party to bring an action."  Id. (citing Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Co., 982 F.2d 363, 371 (9th Cir. 1992)).  At this stage, "[t]he court 'accept[s] the plaintiffs' allegations as true and construe[s] them in the light most favorable to plaintiffs.'"  Metzler Inv. GMBH, 540 F.3d at 1061 (citing Gompper, 298 F.3d at 895).  In ruling on Defendants' Motions to Dismiss, the Court has accepted that the photo array is as Plaintiff alleges—altered and forged. Nevertheless, for the reasons discussed above, Plaintiff does not state a § 1983 or Bivens claim; thus, Plaintiff's inability to obtain the photo array has not damaged his right to bring this action.

### b. Futility of Amendment.

Plaintiff also requests to "include [as a defendant] the Assistant United States Attorney Joseph T. McNally, because the destruction of evidence may not be covered by afforded absolute immunity, as it is out of his duties as a United States Attorney to destroy evidence …."  (Dkt. 113 at 3.)  Plaintiff explains, "the letter from the 'U.S. Department of Justice, Office of Information Policy', informed Cox, that the records are 'located in the United States Attorney's Office for the Southern District of California concerning [Cox's] criminal case.'  This put Cox on notice that it may be in the dominion and control of AUSA McNally, and or others located at the Southern California United States Attorneys Office."[32]  (Id. at 3-4.)

---

[32] It is unclear which letter directed Plaintiff to the Southern District of California.  The letter from the U.S. Department of Justice, EOUSA, dated January 2, 2018, requests that Plaintiff "identify the specific United States Attorney's

"[T]he grant or denial of an opportunity to amend [a complaint] is within the discretion of the District Court." Foman v. Davis, 371 U.S. 178, 182 (1962). "Normally, when a viable case may be pled, a district court should freely grant leave to amend." Cafasso v. General Dynamics C4 Systems, 637 F.3d 1047, 1058 (9th Cir. 2011) (citation omitted).  Liberality in granting leave to amend must be restrained, however, by a court's consideration of a number of factors, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment …." Foman, 371 U.S. at 182.

Futility alone, however, can justify the denial of a motion for leave to amend. Nunes v. Ashcroft, 375 F.3d 805, 808 (9th Cir. 2004); see Lockheed Martin Corp. v. Network Sols., Inc., 194 F.3d 980, 986 (9th Cir. 1999) ("Where the legal basis for a cause of action is tenuous, futility supports the refusal to grant leave to amend.")  "Thus, the 'proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6).'" Nordyke v. King, 644 F.3d 776, 788 n.12 (9th Cir. 2011) (quoting Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988)).  "[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a

office(s) where you believe records may be located." (Dkt. 113 at 8.)  The letter further instructs, "This would be primarily the district(s) in which a prosecution or litigation occurred." (Id.)  Plaintiff's prosecution occurred in the Central District of California, and AUSA McNally prosecutes in the Central District.  The next letter from the EOUSA, dated April 25, 2018, indicates that a search of United States Attorney's Office for the Southern District of California failed to reveal the requested records. (Id. at 10.)  It is unclear whether Plaintiff has directed any of his FOIA requests to the Central District of California.  If not, Plaintiff might want to consider doing so before filing a lawsuit alleging FOIA violations.

valid and sufficient claim or defense." <u>Sweaney v. Ada County, Idaho</u>, 119 F.3d 1385, 1393 (9th Cir. 1997).

Here, granting Plaintiff leave to amend to include a complaint against AUSA McNally would be futile. Prosecutors are absolutely immune from civil suits for damages related to criminal prosecution. <u>Imbler v. Pachtman</u>, 424 U.S. 409, 427 (1976); <u>Ashelman v. Pope</u>, 793 F.2d 1072, 1078 (9th Cir. 1986). If AUSA McNally was performing functions akin to a prosecutor, then he is entitled to this absolute immunity. "A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial, or after conviction is a violation of due process under <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). It is, nonetheless, an exercise of the prosecutorial function and entitles the prosecutor to absolute immunity from a civil suit for damages." <u>Broam v. Bogan</u>, 320 F.3d 1023, 1030 (9th Cir. 2003). Thus, AUSA McNally's alleged decision not to preserve evidence related to Plaintiff's photo line-up falls within the scope of his prosecutorial function and gives rise to immunity; allowing Plaintiff leave to amend his TAC to include this claim would be futile.[33]

**2. Plaintiff's Discovery Requests.**

On March 29, 2018, the Court received a motion from Plaintiff dated March 25, 2018, seeking an order compelling "the State of California, to produce all photos stored by date on the DOJ Cal-Photo Image Network Line-Up Database pertaining to [Plaintiff's] visual image." (Dkt. 97 at 2.) The motion related to four subpoenas issued on January 9, 2018.[34] (Dkts. 76, 77, 78, 79.) Plaintiff stated that

---

[33] In fact, Plaintiff included AUSA McNally as a defendant in his initial complaint. (<u>See</u> Dkt. 1.) In dismissing the complaint with leave to amend, the District Court advised, "Neither an FTCA claim nor a <u>Bivens</u> claim may be based on the alleged wrongdoing of AUSA McNally ...." (Dkt. 7 at 16.) This is still true.

[34] The Court also issued a fifth subpoena on March 6, 2018 (Dkt. 94), but it is unclear whether his motion to compel encompasses it.

41

he served those subpoenas in January 2018.  (Dkt. 97 at 3.)  Plaintiff requests these photos to "show[] that Agent Wesley Schwark, Curt Casler, and James Mikkelson, falsified evidence by claiming a 2008 photograph was shown to witness Jessica Bacque in 2005."  (Id. at 2.)

Plaintiff attached to his motion a letter from the California Department of Justice ("DOJ") dated March 20, 2018, objecting to the subpoenas on the grounds that "criminal history records maintained by the DOJ are privileged and confidential," and are "statutorily prohibited from disclosure" pursuant to several provisions.  (Id. at 5.)  Plaintiff contends that these objections are untimely under Rule 45(d)(2)(B) of the Federal Rules of Civil Procedure and that the information "pertain[s] to [him] personally" and is "directly" relevant to this lawsuit.  (Id. at 1-2.)

On April 9, 2018, the Court stayed Plaintiff's motion because Plaintiff indicated that he had "uncovered" the photograph at the State Parole Office and the motion appeared moot.  (Dkt. 101 at 3, citing Dkt. 96 at 1.)  Plaintiff sought reconsideration of this order, which the Court denied on May 2, 2018.  (Dkts. 106, 108.)

On May 17, 2018, the Court received a letter from Plaintiff stating that the Parole Office does not have the photograph and that Plaintiff therefore renewed his request that the Court compel the California DOJ to respond to his subpoenas.  (Dkt. 112 at 1-2.)  Finding it "premature to order full briefing on Plaintiff's subpoenas to third-parties before he has stated a claim," on July 25, 2018, the Court denied Plaintiff's request to lift the stay.  (Dkt. 129 at 6.)  For the sake of efficiency, the Court requested that the California DOJ file a letter concerning its response to Plaintiff's subpoena demands.  (Id.)

On August 23, 2018, the Court received a responsive letter from the California DOJ, asking that the "Court defer its ruling on the subpoenas until after the motion[s] to dismiss [have] been ruled upon."  (Dkt. 136 at 4.)  On August 31,

2018, the Court continued to defer a ruling on Plaintiff's motion to compel until it has ruled on the motions to dismiss. (Dkt. 139 at 4.) "If the Court finds that Plaintiff states a claim, then it will address the discovery matter." (Id.) On this same day, the Court received a notification from Plaintiff, dated August 27, 2018, that "the California Department of Justice is at this time obstructing justice by failing to comply with subpoena requests." (Dkt. 140 at 1.) Plaintiff again requested that the Court compel the California DOJ to comply with the subpoenas. (Id.)

The Court now finds that Plaintiff has failed to state a claim and grants Defendants' motions to dismiss. As such, the motion related to the California DOJ's response (Dkt. 97) is denied as moot. All persons previously subpoenaed are relieved of any obligation to respond.

## VI.
## CONCLUSION.

For the reasons set forth above, Plaintiff fails to state a claim against Defendants in his Third Amended Complaint.

## VII.
## RECOMMENDATION.

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; and (2) granting Defendants' motions to dismiss without further leave to amend.

DATED:  January 22, 2019

_Karen E. Scott_
KAREN E. SCOTT
United States Magistrate Judge

43